

# IN THE
# Court of Appeals of Indiana

Emily F. Tidd,

*Appellant-Petitioner*

v.

The Estate of Gary Tidd, Sr., Deceased,

*Appellee-Respondent*



FILED

Apr 04 2025, 9:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

April 4, 2025

Court of Appeals Case No.
24A-ES-1395

Appeal from the Hancock Superior Court

The Honorable Donald J. Davis, Judge

Trial Court Cause No.
30D01-2310-ES-165

**Opinion by Judge Weissmann**
Judge Kenworthy and Senior Judge Robb concur.

**Weissmann, Judge.**

[1] Although Emily Tidd had lived with her husband, Gary Tidd, Sr., continuously for the last three years of his life, the probate court ruled that Emily had "abandoned" him and therefore was barred by statute from claiming any portion of his estate upon his death. Based on that ruling, the court denied Emily's claim for a statutory spousal allowance. Emily appeals that ruling, claiming that abandonment in this context requires a physical separation that did not occur here. We agree and reverse the trial court's judgment.

## Facts

[2] Gary and Emily, who both had children from prior relationships, married in 2007. Gary either was retired at that point or retired shortly after. In 2010, Emily relocated to the Chicago area to work at another of her employer's facilities when her local plant closed. But Emily returned to live with Gary in Hancock County on the weekends.

[3] After retiring in December 2014, Emily lived with her son in Alabama for a year and then with her daughter in Indiana for three years. Despite their time living apart, neither Emily nor Gary—who had been divorced twice before— ever filed for legal separation or divorce. When Emily returned to Indiana in 2017 or 2018, Gary and Emily began "dating again" while living in separate residences. Tr. Vol. II, p. 24.

[4] Gary was seriously injured, breaking his neck in three places, when a semi-truck hit his vehicle in January 2020. He spent several months first in a hospital and

then a rehabilitation facility. Shortly before his release, Emily and Gary agreed that she would move back into Gary's home to help care for him. Then in May 2020, Gary's daughter, Tonya Reynolds, drove Gary to a lawyer's office where he executed a Last Will and Testament (Will) that disinherited Emily and granted Tonya all his assets at his death. The Will provided:

> I am not unmindful of my wife, Emily Tidd, but under the facts and circumstances as I know them to be, it is my will and desire that she take no part of my estate and that the same be distributed as hereinabove set forth.

App. Vol. II, p. 25.

The Will named Tonya as personal representative and Gary's son as the successor personal representative if Tonya did not qualify. Gary's son otherwise was not mentioned in the will. Around the same time, Gary executed a transfer on death deed in favor of Tonya for the marital home and adjoining property, which together apparently constituted the only significant assets that Gary owned at his death.

Gary and Emily continued living together for the next three years until Gary's COVID-19-related death. During this period, Gary was hospitalized many times. He suffered a series of mini-strokes and was diagnosed with dementia. Throughout the marriage and until his death, Gary received health insurance coverage through Emily's employer, either as his primary insurance or as a supplement to his Medicare benefits. The insurance premiums were deducted from Emily's monthly retirement check.

[7] Throughout Emily's marriage to Gary, and particularly around the time of Gary's death, Emily had a contentious relationship with Tonya. For instance, Tonya sought to file criminal charges against Emily for allegedly slapping her while Gary was still in the rehabilitation center. Tonya lived nearby and had frequent contact with Gary, who had executed a power of attorney in favor of Tonya. Yet when Tonya provided information for Gary's death certificate, she stated she did not know if Emily and Gary, who wed 17 years earlier and had been living together for years at his death, were still married.

[8] After Gary's death, Emily petitioned to open a supervised estate, alleging that Gary died intestate. She also sought and obtained her appointment as personal representative. Tonya objected, alleging that Emily misrepresented Gary's intestacy and that Tonya was Gary's sole heir under the May 2020 Will, which Tonya attached to her filing. Tonya also alleged that "there are no probate assets to be administered under such will and the estate is insolvent." *Id.* at 23.

[9] Tonya requested the Will be admitted to probate, that letters testamentary be granted to her, and that she, as Gary's daughter, be named personal representative. Emily objected, alleging that Tonya could not fulfill a fiduciary duty as personal representative due to her animosity for Emily. Attached to Emily's objection was a purported text message from Tonya in which Tonya said she would "lo[se] everything before Emily gets anything." *Id.* at 31.

[10] Emily also petitioned to take against the Will as the surviving spouse and for a spousal allowance of $25,000. Tonya objected, claiming Emily had abandoned

Gary and therefore forfeited her interest in his estate under Indiana Code § 29-1-2-15 (Disinheritance Statute), which provides:

> If a person shall abandon his or her spouse without just cause, he or she shall take no part of his or her estate or trust.

[11] After an evidentiary hearing, the probate court ordered Emily removed as personal representative and named Tonya as her successor. When Tonya failed to act on Emily's claim for a spousal allowance, Emily requested a court hearing.

[12] During the hearing, Tonya and her husband, Richard Reynolds, who also is Emily's brother, testified that Emily and Gary had a miserable relationship throughout their marriage. They reported that Emily repeatedly made disparaging comments about Gary and expressed her hatred for him. Tonya acknowledged Emily later apologized for and retracted some of her disparaging statements. Tonya and Richard also testified that although Gary was in terrible health in the last months of his life, Emily did not assist Gary. They claimed she failed to help him with meals and did not call for an ambulance when he needed one.

[13] Emily, on the other hand, testified that she and Gary had a good relationship in the three years prior to his death and that she took him grocery shopping when he wanted to go. When he did not accompany her, she would buy items for him if he asked. The couple never had joint bank accounts, according to Emily. Although she did not contribute to household expenses after Gary's

hospitalization, she paid several household bills for the marital home when she was working in Chicago.

[14] The probate court ruled that although Emily and Gary were legally married at the time of his death, "the presence of a marital relationship between Emily and Gary was absent." App. Vol. II, p. 14. The court concluded that Emily and Gary "lived as roommates but maintained separate lives" and that Emily had failed to provide support "one would customarily find in a marital relationship such as sharing household duties, preparing meals, shopping for groceries, attending doctor visits[,] etc." *Id.* The court also noted that Emily had at times stated she "loathed" and hated Gary. *Id.*

[15] The trial court viewed the parties' co-habitation as essentially irrelevant to whether Emily "abandoned" Gary for purposes of the Disinheritance Statute. Defining "abandon" to require physical separation of the spouses "is contrary to the plain language of [the Disinheritance Statute]," according to the trial court. *Id.* The court concluded: "Simply put, physical separation is not a factor under [the Disinheritance Statute]." *Id.* The court then found that "abandon" in this context means "relinquishing duties customarily present in a relationship." *Id.* at 15.

[16] The trial court did not make any explicit finding that Emily's alleged abandonment of Gary was "without just cause," as required by the Disinheritance Statute. Instead, it appears to have merely assumed Emily's alleged abandonment of Gary was without just cause because, in the trial

court's view, Emily had relinquished duties customarily present in a marriage relationship. Based on this analysis, the probate court determined Emily had abandoned Gary under the Disinheritance Statute. The court therefore denied Emily's request for the spousal allowance—a decision that Emily now appeals.

## Discussion and Decision

[17] Emily challenges the probate court's ruling on two grounds. First, she claims that the probate court applied the wrong burden of proof. Second, she claims the probate court ignored precedent and legislative intent in determining that under the Disinheritance Statute, she "abandoned . . . her spouse without just cause" and therefore "shall take no part of his . . . estate." Ind. Code § 29-1-2-15.

[18] In making these arguments, Emily does not challenge the probate court's determination of the facts. The outcome of this appeal therefore rests on the propriety of the probate court's interpretation of the Disinheritance Statute. "The interpretation of a statute is a question of law, which we review de novo." *Service Steel Warehouse Co., L.P. v. United States Steel Corp.*, 182 N.E.3d 840, 842 (Ind. 2022).

[19] We conclude that the trial court applied the wrong burden of proof and that "abandon," as used in the Disinheritance Statute, requires physical separation of the married couple without their mutual consent. As the undisputed facts establish Emily never physically separated from Gary during the three years before his death, we reverse.

## I. Burden of Proof

The party seeking to enforce the Disinheritance Statute against the surviving spouse—here, the Estate—bears the burden of proving the Statute's application. *Morehouse v. Koble*, 141 N.E. 254, 255 (Ind. Ct. App. 1923). As to the burden of proof, our Supreme Court more than a century ago ruled that the appropriate burden of proof in this context is clear and convincing evidence. *Hill v. Taylor*, 186 Ind. 680, 117 N.E. 930, 931 (1917).[1] *Hill* has never been overruled.

The probate court erroneously held the Estate to a lesser burden of proof. It applied a preponderance of the evidence standard when it determined that Emily was barred by the Disinheritance Statute from any share of Gary's estate. We therefore agree with Emily that the probate court committed reversible error by applying the wrong burden of proof.

## II. Definition of "Abandon"

The probate court also misinterpreted the language of the Disinheritance Statute, which applies to situations in which "a person . . . abandon[s] his or her spouse without just cause." Ind. Code § 29-1-2-15. The probate court's ruling that physical separation is not required for abandonment directly

---

[1] The Court of Appeals also appears to have applied that standard in its only decision since *Hill* that cites the burden of proof applicable to the Disinheritance Statute. *Est. of Burnham v. Labean*, No. 71A03-1201-ES-30, 2012 WL 4077567, at *2 (Ind. Ct. App. Sept. 18, 2012). Because *Burnham* is a memorandum decision issued before January 1, 2023, we do not rely on it for precedential value. *See* Ind. Appellate Rule 65(D)(2).

contradicts our Supreme Court's holding in *Hill* and the few appellate decisions interpreting *Hill* over the last century.

[23] As previously noted, statutory interpretation is a question of law reviewed de novo on appeal. *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016). The first task when interpreting a statute is to give its words their plain meaning and consider the structure of the statute as a whole. *West v. Off. of Ind. Sec'y of State*, 54 N.E.3d 349, 353 (Ind. 2016). "[I]nterpretations that depend on 'selective reading of individual words' that lead to irrational and disharmonizing results" are to be avoided. *Id.* at 355 (quoting *Prewitt v. State*, 878 N.E.2d 184, 186 (Ind. 2007)). If no ambiguity in the language exists, delving into legislative intent is unnecessary. *Tom James Co. v. Zurich Am. Ins. Co.*, 221 N.E.3d 1261, 1271 (Ind. Ct. App. 2023) (citing *Adams v. State*, 960 N.E.2d 793, 798 (Ind. 2012)).

[24] The "abandon" language in the Disinheritance Statute appears to have been in place since at least 1853. *See Hinton v. Whittaker*, 101 Ind. 344, 345-46 (1885) (noting that the Disinheritance Statute, then codified as Rev. St. 1881, § 2498 (Burns' Ann. St. § 6-2331), provided between 1853 and 1885 that "[i]f a husband shall abandon his wife, without just cause, failing to make suitable provision for her, or for his children, if any, by her, he shall take no part of her estate"). In *Hinton*, our Supreme Court affirmed a jury's verdict that the husband should not inherit from his wife's estate when he provided no support to her after they began living separately the year before her death. *Id.* at 348.

The version of the Disinheritance Statute in effect when *Hinton* was decided remained unchanged—though the statute had been recodified—when our Supreme Court in 1917 decided *Hill*. 117 N.E. at 931. The *Hill* Court determined that abandonment, as used in the Disinheritance Statute, meant "the act of a husband or wife *who leaves his or her consort willfully*, without justification either in the consent or wrongful conduct of the other, and with an intention of causing a perpetual separation of the parties." *Id.* at 931 (emphasis added).

Although the Court made clear that physical separation was a requirement of the Disinheritance Statute, the Court ruled that physical separation alone is not enough to trigger the Statute's application. "The refusal by a husband to follow his wife to a new residence does not constitute abandonment," according to the Court, and neither does "separation by mutual consent." *Id.* at 931-32. This is because "separation by mutual consent" does not involve "desertion by either party." *Id.* at 931. Applying this definition to the facts of the case before it, the Court concluded that the husband had not abandoned his wife because their separation was by mutual consent and there was "no evidence whatever that [Husband] at any time *left the home* of the parties." *Id.* at 932 (emphasis added).

Although the language of the Disinheritance Statute has changed somewhat over the past century since *Hill*, the Statute's requirement of an abandonment by the surviving spouse remains. So does our Supreme Court's interpretation that this abandonment, at a minimum, requires a physical separation of the

spouses. The appellate decisions applying the Disinheritance Statute since *Hill* all have required a non-consensual physical separation.

[28] For instance, in *Morehouse v. Koble,* 141 N.E. 254, 255 (Ind. Ct. App. 1923), this Court found that though the parties had physically separated, the Disinheritance Statute did not apply because the separation was "by mutual consent." The Court concluded that "[a]bandonment as used in this statute, and as applied to the instant case, implies a want of consent, an unwillingness, on the part of the wife." *Id.* And "[n]ot only must be there an abandonment in order to prevent a widower from taking an interest in the property of his deceased wife, but such abandonment must be without just cause." *Id.*

[29] Though *Morehouse* was decided when the Disinheritance Statute only applied to a husband's abandonment of his wife, this view of abandonment as requiring a non-consensual physical separation has not changed since the Disinheritance Statute became gender neutral. In *Est. of Calcutt v. Calcutt*, 576 N.E.2d 1288, 1294 (Ind. Ct. App. 1991)*,* for instance, this Court ruled that "Indiana courts have defined abandonment as: 'the act of a husband or wife who leaves his or her consort willfully, without justification either in the consent or wrongful conduct of the other, and with an intention of causing a perpetual separation of the parties . . . .'" *Id.* (quoting *Morehouse*, 141 N.E. at 255). The *Calcutt* Court found that a husband who lived with his wife until she was hospitalized 11 days before her death did not "abandon" her for purposes of the Disinheritance Statute simply by limiting his time with her at the hospital and socializing with another woman instead. *Id.* at 1294. The court reasoned that "abandonment

requires the act of leaving one's spouse with the intent to cause a lasting separation." *Id.*

[30] And finally, in *In re Estate of Patrick*, 958 N.E.2d 1155, 1160 (Ind. Ct. App. 2011), this Court found that a husband did not abandon his wife for purposes of the Disinheritance Statute by living at his father's home for several weeks while his wife filed for divorce. Because they "separated by mutual consent," the Court found no abandonment occurred. *Id.*

[31] Each of these post-*Hill* interpretations of the Disinheritance Statute applied *Hill's* view that the Statute requires a non-consensual physical separation of the spouses without just cause. In light of this precedent, we conclude that to prove application of the Disinheritance Statute, the party seeking to apply the Statute must establish by clear and convincing evidence two requirements: (1) that the surviving spouse abandoned the other spouse—that is, they physically separated without mutually consenting to the separation; and (2) the separation was without just cause. If either of these requirements is not met, the Disinheritance Statute does not apply.[2]

---

[2] The Estate's reliance on Indiana Code § 29-1-2-14 (Adultery Statute) is unavailing. The Adultery Statute provides that, "[i]f either a husband or wife shall have *left* the other and shall be living at the time of his or her death in adultery, he or she as the case may be shall take no part of the estate or trust of the deceased husband or wife." Ind. Code § 29-1-2-14 (emphasis added). The Estate concludes that the use of different language in the two statutes—"left" in Adultery Statute and "abandon" in the Disinheritance Statute— suggests the legislature intended "left" and "abandon" to mean different things and for the two statutes to apply differently.

## III.  The Disinheritance Statute Does Not Apply

The Disinheritance Statute did not bar Emily from seeking a statutory spousal allowance from the Estate because Emily never "abandoned" Gary within the meaning of the Statute.  Neither Emily nor the Estate contests the trial court's finding that Emily and Gary lived together continuously during the last three years of Gary's life.  Emily therefore could not have "abandoned" Gary within the meaning of the Disinheritance Statute because the couple was married and not physically separated without mutual consent when he died.

Contrary to the trial court's analysis, the manner in which a married couple chooses to live together within their shared home—including the couple's

---

But given that our Supreme Court already has determined the meaning of the Disinheritance Statute from the plain language in that statute, resort to the rules of statutory construction—including comparison to similar statutes—is unnecessary. *See McCabe v. Commissioner, Ind. Dept. of Ins.,* 949 N.E.2d 816, 819 (Ind. 2011); *Klotz v. Hoyt*, 900 N.E.2d 1, 5 (Ind. 2009) (noting that as a rule of statutory construction, statutes that relate to the same general subject matter "should be construed together so as to produce a harmonious statutory scheme").

Regardless, Indiana's appellate courts have rejected the view that "left" in the Adultery Statute means something different from "abandoned" in the Disinheritance Statute. In appeals interpreting the Adultery Statute, the courts have used "left" and "abandoned" interchangeably to mean a physical separation. *See, e.g., Shaffer v. Richardson's Adm'r*, 27 Ind. 122, 125, 128 (1866) (ruling that where husband "left" and "abandoned" wife before she concluded he was dead and remarried, the Adultery Statute did not apply to wife); *In re Estate of Hanneman*, 999 N.E.2d 972, 973 (Ind. Ct. App. 2013) (finding that the Adultery Statute applied only when the spouse had "voluntarily abandoned" the dead spouse and was living in adultery at the time of the death); *In re Estate of Patrick*, 958 N.E.2d 1155, 1160 (Ind. Ct. App. 2011) ("[W]e conclude that in order to divest [husband] of his survivor's share [under the Adultery Statute], the Estate was required to prove that he 'left' [wife]. 'Left' in this context means abandoned."); *Spade v. Hawkins*, 60 Ind. App. 388, 110 N.E. 1010, 1011-12 (1916) (using "abandoned" and "left" interchangeably while applying Adultery Statute).

And even in *Hill*, which applied the Disinheritance Statute rather than the Adultery Statute, our Supreme Court used both "abandon" and "left" when determining that husband did not abandon his wife. 117 N.E. at 932 (finding that there was "no evidence whatever that [husband] at any time left the home of the parties," although he lived with his mother while wife cared for her parents in the parents' home).

treatment of and comments about each other and the manner in which they divide financial and domestic responsibilities—is of no moment in determining the Disinheritance Statute's application. By requiring that abandonment include physical separation without mutual consent, the Disinheritance Statute creates a bright line that eliminates any need to intrude into the intimate details of the marital lives of spouses who choose to remain living together without filing for legal separation or divorce.

[34] Whatever Emily's or Gary's reasons for staying together and no matter the level of disrespect or apathy that Emily allegedly displayed as a spouse, it is undisputed that they were legally married and living together continuously for the three years before Gary's death. That is enough under existing precedent to render the Disinheritance Statute inapplicable.

[35] This outcome is in keeping with the legislative framework for spousal inheritance. Although a spouse may leave nothing to the surviving spouse in a will, the legislature has effectively ensured that the surviving spouse generally cannot be entirely disinherited. *See* Indiana Code § 29-1-4-1(a) (allowing the surviving spouse to claim an allowance of $25,000 against the estate of the deceased spouse); Ind. Code § 29-1-3-1 (allowing a surviving spouse the right to take against their deceased spouse's will).

[36] The approach espoused by the Estate effectively defeats the intent of the spousal allowance statute and creates a disincentive to remaining married. Ind. Code § 29-1-4-1(a). The Estate acknowledged that if Emily and Gary had, in fact,

divorced, Emily would have shared in the marital estate, including all or part of Gary's separately owned property. *See* Ind. Code § 31-15-7-4 (requiring the dissolution court to divide the parties' property, whether it was acquired jointly or individually); Ind. Code § 31-15-7-5 (presuming an equal split of the marital property between the parties is "just and reasonable"). Emily instead stayed married to Gary for 17 years, and for many years earned much of the marital income and contributed to marital expenses. Yet under the Estate's analysis, because Emily continued living with Gary in an allegedly unhappy marriage and Gary disinherited her in his will, Emily deserves nothing from the marital estate other than her own belongings.

## IV. Conclusion

[37] The probate court applied the wrong burden of proof and the wrong analysis in determining that the Disinheritance Statute barred Emily's claim for a spousal allowance. The probate court's analysis deviated from established precedent defining "abandonment" for purposes of the Disinheritance Statute as requiring a physical separation without mutual consent. Here, no abandonment occurred because Emily and Gary remained married and living together at the time of his death. Emily's alleged disparaging remarks about Gary and what the trial court viewed as the couple's non-traditional marital roles are irrelevant under existing law to determine whether she abandoned Gary for purposes of the Disinheritance Statute.

[38] Accordingly, we reverse the trial court's judgment that applied the Disinheritance Statute to deny Emily's claim for a spousal allowance.

Kenworthy, J. and Robb, Sr.J., concur.

ATTORNEY FOR APPELLANT

Ann C. Coriden
Ann Coriden Law, LLC
Columbus, Indiana


ATTORNEY FOR APPELLEE

Briane M. House
Pritzke & David, LLP
Greenfield, Indiana